UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANTHONY GARVER,

                Petitioner,

    v.

STATE OF WASHINGTON,

              Respondent.

CASE NO. 2:23-cv-01429-RAJ-BAT

**REPORT AND
RECOMMENDATION**

Petitioner is a prisoner currently confined at Washington State Penitentiary in Walla Walla, Washington. Petitioner proceeds *pro se* and *in forma pauperis* and seeks habeas relief under 28 U.S.C. § 2254 from a 2019 Snohomish County Superior Court judgment and sentence. Dkts. 10, 16, 18 at 304-318. Respondent has filed an answer to Petitioner's habeas petition and submitted relevant portions of the state court record. Dkts. 17, 18. Petitioner has filed a response to Respondent's answer. Dkt. 22. Petitioner has also filed a "motion for praecipe or amend petition" seeking to substitute Rob Jackson as the Respondent. Dkt. 20. Respondent did not oppose or otherwise respond to that motion.

The Court having considered the parties' submissions, and the record, recommends GRANTING Petitioner's "motion for praecipe or to amend petition" (Dkt. 20) and substituting Rob Jackson as the Respondent in this action, DENYING the federal habeas petition (Dkts. 10,

REPORT AND RECOMMENDATION - 1

16, 20) without an evidentiary hearing and DISMISSING the case with prejudice. The Court also recommends that issuance of a certificate of appealability (COA) be DENIED.

## FACTUAL AND PROCEDURAL HISTORY

The Washington Court of Appeals (Court of Appeals), in its opinion resolving Petitioner's direct appeal, summarized the facts relevant to the crime at issue as follows:

On June 17, 2013, Phillipa Evans-Lopez was found dead in a Lake Stevens home. The medical examiner determined she had died by homicide a couple of days before her body was discovered. She had been bound to a bed and had 24 stab wounds to her chest. Her throat had been slashed.

The Washington State Patrol Crime Laboratory (WSPCL) sent a team to help process the scene for evidence. Blood spatter evidence indicated that Evans- Lopez had been tied to the bed when most of the blood-letting occurred. It also indicated the blood spatter was deposited in a left to right direction.

The WSPCL team located deoxyribonucleic acid (DNA) and semen on Evans-Lopez's body that were a match for Anthony Garver. Garver's picture matched video surveillance from a McDonald's restaurant of a male seen with Evans-Lopez early in the morning on June 14, 2013. A witness later encountered Evans-Lopez and Garver at Walmart between five and seven in the morning. Evans-Lopez told the witness she and Garver were going to her house to get Garver a laptop. Garver had told Evans-Lopez that he was good with computers and could help her with identity theft.

On July 2, 2013, Garver was arrested at the McDonald's on an existing warrant. He agreed to a recorded interview that was transcribed and admitted into evidence. When arrested, Garver possessed a knife. DNA on the knife blade matched both Garver and Evans-Lopez. He also possessed a laptop used by Evans-Lopez. It contained documents related to killing someone with a knife and internet searches of a murder in Lake Stevens.

The State charged Garver with first degree murder with a deadly weapon. Garver waived his right to a jury trial. A CrR 3.5 hearing was held to determine the admissibility of Garver's postarrest statements to law enforcement. The statements were found admissible. No written findings of fact or conclusions of law were entered.

At the bench trial, the State entered blood spatter evidence, including exhibit 193, a photograph of Evans-Lopez's mattress and headboard. It did not offer expert witness testimony on how to interpret that exhibit.

On October 29, 2019, the trial court gave an oral ruling on the case. The trial court's remarks included the following statement:

In Exhibit 193, blood spatter in the master bedroom is mapped by the technicians. When you look at this exhibit it is clear that the pattern goes up and to the right, as you view it from the foot of the bed.

1

2

> One of the things you get to know in doing this work is that physical damage is often inflicted from the dominant hand. So the person was -- so if the person was right handed leaning over the body, and swiped the throat with this amount of force, you would expect the blood spatter to go up and to the left. But it doesn't. It goes up and to the right. When I was watching the video of Anthony signing his interview statement, I noticed that he signed left handed. The blood spatter pattern supports an inference that the assailant was left handed.

3

4

5

> The trial court found Garver guilty as charged.

6

Dkt. 18 at 91-93.

7

Petitioner appealed his conviction to the Court of Appeals arguing that the trial court

8

made improper factual conclusions based on matters outside of the trial record regarding the

9

blood spatter pattern and that the trial court was required to enter written findings following the

10

CrR 3.5 hearing and after the bench trial under CrR 6.1(d).[1] Dkt. 18, Ex. 1. The Court of Appeals

11

affirmed Petitioner's conviction for first-degree murder with a deadly weapon in an unpublished

12

opinion. *Id.*, Ex. 4. The Court of Appeals stated that after Petitioner filed his brief on direct

13

appeal, written findings of fact and conclusions of law were filed for both the CrR 3.5 hearing

14

and for the bench trial pursuant to CrR 6.1(d) that did not include the challenged inference

15

regarding blood spatter evidence. *Id.* The Court found that the written findings and conclusions

16

controlled over any remarks made during the trial court's oral decision and that such remarks did

17

not form a basis for the conclusions reached by the court. *Id.* The Court further found Petitioner

18

had not demonstrated the trial court's findings and conclusions were inappropriately tailored,

19

that he suffered any prejudice by the omission of the challenged remarks from the written

20

21

22

23

---

[1] Washington Superior Court Rule CrR 3.5 requires the court to enter written findings of fact and conclusions of law after the conclusion of hearings such as the hearing to determine the admissibility of post-arrest statements to law enforcement. *See* Dkt. 18, Ex. 4 at 94. Washington Superior Court Rule CrR 6.1(d) requires written findings of fact and conclusions of law be entered after a bench trial. *Id.*; *State v. Head*, 136 Wn.2d 619, 621-22 (1998).

findings, and that the omission of the oral remarks about blood spatter was not reversible error. *Id.* Petitioner moved for reconsideration and the motion was denied. *Id.* at Exs. 5, 6.

Petitioner petitioned for discretionary review in the Washington Supreme Court. *Id.*, Ex. 7. On January 5, 2022, the Washington Supreme Court denied review without comment. *Id.*, Ex. 8. The Court of Appeals issued its mandate on January 20, 2022. *Id.*, Ex. 9.

On December 3, 2022, Petitioner filed a personal restraint petition (PRP) in the Court of Appeals. *Id.*, Ex. 10. Petitioner argued his Fourteenth Amendment due process rights were violated because his conviction was obtained based upon false evidence including: evidence he used a laptop to search for news of the murder, that he admitted guilt to a jailhouse informant, that a witness testified falsely about Petitioner's whereabouts around the time of the crime, and it was falsely claimed that the victim's DNA on the knife was evidence of Petitioner's guilt. *Id.* at 243-246. Petitioner also argued that expert testimony regarding knife mark testing on electrical cords used to restrain the victim was inadmissible because it did not meet the *Frye*[2] standard for admissibility. *Id.* 256-66. Petitioner further argued substantial evidence did not support his conviction. *Id.* at 273-87.

On May 8, 2023, the Court of Appeals dismissed the PRP. *Id.*, Ex. 12. Petitioner sought discretionary review by the Washington Supreme Court which was denied. *Id.*, Exs. 13, 14. A certificate of finality issued on October 13, 2023. *Id.*, Ex. 15. On September 4, 2023, Petitioner signed the instant federal habeas petition. Dkts. 1, 10. The petition was originally filed in the

---

[2] Under Washington state law, in evaluating the admissibility of scientific expert testimony, courts apply the "general acceptance" test articulated in *Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923). *See State v. Copeland*, 130 Wash. 2d 244, 261, 922 P.2d 1304, 1315 (1996). In applying the *Frye* test, Washington courts look to see: "1) whether the underlying theory is generally accepted in the scientific community and (2) whether there are techniques, experiments, or studies utilizing that theory which are capable of producing reliable results and are generally accepted in the scientific community." *State v. Riker*, 123 Wash. 2d 351, 359, 869 P.2d 43, 47–48 (1994).

REPORT AND RECOMMENDATION - 4

1   Eastern District of Washington and was transferred to this Court on September 8, 2023. Dkt. 4.

2   Respondent has filed an answer and Petitioner has filed a response to the answer as well as a

3   "motion for praecipe or amend petition." Dkts. 17, 20, 22.

### GROUNDS FOR RELIEF

5   Petitioner raises the following grounds for federal habeas relief in his petition and

6   subsequently filed supporting brief:

7   (1) Due Process violation for the use of false evidence. Dkt. 10 at 5; Dkt. 16 at 7-9.

8   (2) False Information Due Process Violation. Dkt. 10 at 7; Dkt. 16 at 10-17.

9   (3) Due Process Violation for false evidence. Dkt. 10 at 8; Dkt. 16 at 18-21.

10  (4) Reasonable Doubt and Sufficiency of the Evidence. Dkt. 10 at 10; Dkt. 16 at 22-29.

### DISCUSSION

12  **I.    Proper Respondent**

13  In his petition, Petitioner named the State of Washington as the Respondent. Dkt. 10. In

14  the answer, Respondent moves, in part, to dismiss the petition for lack of personal jurisdiction

15  based upon the failure to name the proper respondent. Dkt. 17. Petitioner then filed a "motion for

16  praecipe or amend petition" seeking to amend his petition solely to the extent of changing the

17  Respondent to Rob Jackson, the Superintendent of the Washington State Penitentiary (WSP).

18  Dkt. 20. Respondent did not oppose or otherwise respond to the motion.

19  The proper respondent to a habeas petition is the "person who has custody over [the

20  petitioner]." 28 U.S.C. § 2242; *see also* § 2243; *Brittingham v. United States*, 982 F.2d 378 (9th

21  Cir. 1992); *Dunne v. Henman*, 875 F.2d 244, 249 (9th Cir. 1989). Accordingly, the Court

22  recommends granting Petitioner's "motion for praecipe or to amend petition" (Dkt. 20) and

substituting Rob Jackson as the Respondent in this action. The Court recommends the petition

not be dismissed based on a lack of personal jurisdiction.[3]

## II.    Legal Standards

### A.  Exhaustion

Before seeking federal habeas relief, a state prisoner must exhaust the remedies available

in the state courts. The exhaustion requirement reflects a policy of federal-state comity, intended

to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its

prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation and

citation marks omitted).

There are two avenues by which a petitioner may satisfy the exhaustion requirement.

First, a petitioner may properly exhaust his state remedies by "fairly presenting" his claim in

each appropriate state court, including the state supreme court with powers of discretionary

review, thereby giving those courts the opportunity to act on his claim. *Baldwin v. Reese*, 541

U.S. 27, 29 (2004); *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). "It has to be clear from the

petition filed at each level in the state court system that the petitioner is claiming the violation of

the federal constitution that the petitioner subsequently claims in the federal habeas petition."

*Galvan v. Alaska Dep't of Corrections*, 397 F.3d 1198, 1204 (9th Cir. 2005).

Second, a petitioner may technically exhaust his state remedies by demonstrating that his

"claims are now procedurally barred under [state] law." *Gray v. Netherland*, 518 U.S. 152, 162-

63 (1996) (quoting *Castille v. Peoples*, 489 U.S. 436, 351 (1989)); *see also Smith v. Baldwin*,

510 F.3d 1127, 1139 (9th Cir. 2007) (en banc).  If the petitioner is procedurally barred from

---

[3] Respondent does not challenge service of the petition based on the lack of personal jurisdiction and did not oppose or otherwise respond to Petitioner's motion seeking to amend the petition to name the proper Respondent. Therefore, the Court finds an amended service order is not necessary in this case.

1    presenting his federal claims to the appropriate state court at the time of filing his federal habeas

2    petition, the claims are deemed to be procedurally defaulted for purposes of federal habeas

3    review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). A habeas petitioner who has defaulted

4    his federal claims in state court meets the technical requirements for exhaustion because "there

5    are no state remedies any longer 'available' to him." *Coleman v. Thompson*, 501 U.S. 722, 732

6    (2007). Federal habeas review of procedurally defaulted claims is barred unless the petitioner can

7    either demonstrate cause for the default and actual prejudice as a result of the alleged violation of

8    federal law, or demonstrate that failure to consider the claims will result in a fundamental

9    miscarriage of justice. *Id.* at 724.

10        *B.  Merits Review*

11        Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the Court may

12    grant a habeas corpus petition with respect to any claim adjudicated on the merits in state court

13    only if (1) the state court's decision was contrary to, or involved an unreasonable application of,

14    clearly established federal law, as determined by the Supreme Court, or (2) the decision was

15    based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C.

16    § 2254(d). In considering claims under § 2254(d), the Court is limited to the record before the

17    state court that adjudicated the claim on the merits, and the petitioner carries the burden of proof.

18    *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011); *see also Gulbrandson v. Ryan*, 738 F.3d 976,

19    993 (9th Cir. 2013). "When more than one state court has adjudicated a claim, [the Court

20    analyzes] the last reasoned decision." *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005)

21    (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

22        Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

23    only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See id*. at 407-09. The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, under the AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. This includes the Supreme Court's holdings, not its dicta. *Id.* "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

Regarding § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's conclusion was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(d)(2)); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not

1    be overturned on factual grounds unless objectively unreasonable in light of the evidence

2    presented in the state-court proceedings."). The Court presumes the state court's factual findings

3    to be sound unless the petitioner rebuts "the presumption of correctness by clear and convincing

4    evidence." *Miller-El*, 545 U.S. at 240 (quoting 28 U.S.C. § 2254(e)(1)).

5    **III.    Analysis**

6          *A.   Grounds One and Three*

7          In Grounds One and Three Petitioner alleges "Due Process Violation for the use of false

8    evidence." Dkt. 10 at 5, 8; Dkt. 16 at 7-9, 18-21. Specifically, Petitioner alleges false evidence

9    was presented regarding: (1) internet searches he performed related to the victim's murder; (2)

10   the testimony of a jailhouse informant; (3) testimony from a witness that Petitioner did not have

11   an alibi in that he was not present at the abandoned house they both lived at around the time of

12   the murder; (4) that touch DNA evidence found at the scene constituted evidence Petitioner

13   committed the homicide, and (5) that evidence of the victim's DNA on a knife found on

14   Petitioner when he was arrested was evidence of the murder because the victim had given

15   Petitioner the knife weeks before the murder and because the DNA evidence on the knife was the

16   result of contamination by the expert (Richard Wyant) during the course of scientific testing. *Id.*

17         "[A] conviction obtained by knowing use of perjured testimony is fundamentally unfair,

18   and must be set aside if there is any reasonable likelihood that the false testimony could have

19   affected the judgment of the jury." *U.S. v. Agurs*, 427 U.S 97, 103 (1975) (footnotes omitted);

20   *Giglio v. U.S.*, 405 U.S. 150, 153 (1972). "[T]he knowing use of false testimony to obtain a

21   conviction violates due process regardless of whether the prosecutor solicited the false testimony

22   or merely allowed it to go uncorrected when it appeared." *U.S. v. Bagley*, 473 U.S. 667, 679 n.8

23   (1985); *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).

1      "A habeas petitioner seeking relief based on the presentation of false testimony by a

2  prosecution witness [sometimes referred to as a *Napue* claim] must show not only that the

3  witness testified falsely but also that the prosecution knew or should have known that the witness

4  testified falsely and that the false testimony was material, *i.e.*, there is a reasonable likelihood

5  that the false testimony affected the jury's decision." *Torres v. Ducart*, 2017 WL 2804030 (C.D.

6  Cal. Jan 18, 2017) (citing *Gentry v. Sinclair*, 705 F.3d 884, 903 (9th Cir. 2013)); *Hayes v. Ayers*,

7  632 F.3d 500, 520 (9th Cir. 2011); *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (*en banc*);

8  *see also Bagley*, 473 U.S. at 680, n.9. However, mere inconsistencies in the evidence do not

9  constitute the knowing use of perjured testimony by the prosecutor. *U.S. v. Zuno-Arce*, 44 F.3d

10  1420, 1423 (9th Cir. 1995). "The fact that a witness may have made an earlier inconsistent

11  statement, or that other witnesses have conflicting recollections of events, does not establish that

12  the testimony offered at trial was false." *U.S. v. Croft*, 124 F.3d 1109, 1119 (9th Cir.

13  1997). "Discrepancies in [. . .] testimony [. . .] could as easily flow from errors in recollection as

14  from lies." *Zuno-Arce*, 44 F.3d at 1423. A "[p]etitioner must point to something in the

15  prosecutor's questioning, or the answers given, that may be construed as reflecting an intention

16  by the prosecutor to mislead the jury." *Gomez v. Adams*, 555 F.Supp.2d 1070, 1091 (C.D. Cal.

17  2008) (*citing U.S. v. Etsitty*, 130 F.3d 420, 424 (9th Cir. 1997)). Moreover, conclusory assertions

18  of perjured testimony are insufficient to establish a *Napue* claim. *Henry v. Ryan*, 720 F.3d 1073,

19  1084 (9th Cir. 2013).

20      In deciding Petitioner's PRP, the Court of Appeals rejected Petitioner's false testimony

21  claims, stating:

22          The evidence presented at trial established that Garver and the victim were
        together, and captured on video surveillance footage, a few days before her body
23      was found. On the last day she was seen alive, the victim told a friend that she and Garver
        were going to the house where she was staying to get a laptop for Garver to use. Garver
        was identified by DNA and semen evidence found in the house and on the victim's body.

When he was arrested two weeks after the murder, Garver had a knife in his possession, and DNA on the knife blade matched both Garver and the victim. He also possessed a laptop computer that had been used by the victim and contained documents related to research about killing someone with a knife.

Garver contends that an individual with whom he shared an abandoned house at the time of the murder falsely testified that Garver disappeared from the house for several days around the time of the murder. And Garver claims that a fellow jail inmate falsely testified that Garver threatened to slit the inmate's throat, as he had done to the victim. Nothing in the materials before this court establishes that the identified testimony was false or that the prosecutor elicited perjured testimony. Where, as here, a petitioner's allegations are based on matters outside the record,

> the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief. If the petitioner's evidence is based on knowledge in the possession of others, he may not simply state what he thinks those others would say, but must present their affidavits or other corroborative evidence. The affidavits, in turn, must contain matters to which the affiants may competently testify. In short, the petitioner must present evidence showing that his factual allegations are based on more than speculation, conjecture, or inadmissible hearsay.

*In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Garver fails to satisfy this burden. Garver's bare assertions and conclusory allegations are insufficient to command judicial consideration. *See In re Pers. Restraint of Webster*, 74 Wn. App. 832, 833, 875 P.2d 1244 (1994).

Garver also maintains that the State's use of other evidence was "false or misleading." For instance, he claims that the State made him look guilty by presenting evidence that, after the victim was killed, he searched the internet for news about murders in Lake Stevens, where the crime occurred, even though people are commonly curious about local crimes. Likewise, Garver suggests it was improper for the State to rely on DNA and semen evidence, since according to his version of events, there was a reasonable explanation for the presence of both because he was admittedly inside the house where the victim was found and had consensual sexual contact with her. And he argues that it was improper for the State to rely on the presence of the victim's DNA on the knife found in Garver's possession upon his arrest because, according to his testimony, the victim gave the knife to him several weeks before she was killed. But the State was entitled to argue any inferences supported by the evidence, and the finder of fact, here the trial court judge, was free to weigh the competing inferences supported by the evidence.

…

Garver also claims that the [State's expert Richard Wyant] provided "false testimony" about possible DNA transfer between pieces of evidence handled in the testing process. The portion of testimony Garver relies on does not substantiate his claim. The witness acknowledged at trial, consistent with a prior interview, that DNA transfer in the testing process was possible but unlikely, because the knife admitted into evidence was not used in the testing process to cut the actual electrical cords submitted into evidence. Any alleged inconsistency between the prior interview and trial testimony was simply a basis to impeach the witness, not trial court error.

Dkt. 18 at 210-13.

REPORT AND RECOMMENDATION - 11

In denying Petitioner's petition for review, the Washington Supreme Court also rejected petitioner's false evidence claims, stating:

> To obtain this court's review, Garver must show that the chief judge's decision conflicts with a decision of this court or with a published Court of Appeals decision, or that Garver is raising a significant constitutional question or an issue of substantial public interest. RAP 13.5A(a)(1), (b); RAP 13.4(b). Garver urges the first three criteria, but he does not show that any of them applies. He contends, first, that the State presented "false" evidence consisting of the following: (1) that an internet search by Garver of news about murders in Lake Stevens following the homicide proved guilt, (2) a jailhouse informant's testimony that Garver admitted to the homicide, (3) testimony by a witness that Garver did not have an alibi, (4) that touch DNA evidence constituted evidence he committed the homicide, and (5) that evidence of the victim's DNA on a knife found on Garver was evidence of the murder. As to most of this purportedly "false" testimony, Garver does not claim that the facts themselves are false but that they do not support a finding of guilt. Whether such items of evidence as the DNA and Garver's internet search supported an inference of guilt was for the trier of fact to decide. The evidence was relevant, and the superior court, as the trier of fact, was entitled to disbelieve Garver's innocent explanations, as it did in finding him not credible. And Garver does not show that the witness testimony to which he refers was false. That he disputes it does not make it so.

Dkt. 18 at 290-291.

The record supports the state courts' findings. At trial, the State introduced testimony of a jailhouse informant, Ervin Cox, that in July 2013 Petitioner told him that he was in prison for murder, that he had "stabbed a girl twenty times" and that he was going to cut Mr. Cox's throat "just like her's." Dkt. 18 at 2738, 2740-41, 2750-51. The State also introduced testimony from Michelle Haines, whom Petitioner was living with in an abandoned house during the relevant period, stating that Petitioner was not at the house for several days around the time of the murder. Dkt. 18 at 2538-39, 2546-47.

Petitioner disputes this testimony, arguing that he never made such a statement to the jailhouse informant. Dkt. 16 at 8-9. He also argues that he and Ms. Haynes lived on different floors at the abandoned house and that, therefore, she would not have known if he was at the house during the relevant period. *Id.* at 5-6, 8. But, as the state courts found, the fact that Petitioner disputes the testimony does not establish that the testimony was false or that the

prosecutor knew or should have known that the testimony was false. Petitioner's conclusory assertions that the testimony was false are insufficient to support a violation of due process under *Napue* and the state courts reasonably rejected these claims.

The State also introduced evidence that the laptop computer, which was found in Petitioner's possession, showed evidence that internet searches had been performed related to news of murder in Lake Stevens. Dkt. 18 at 2793-94. Petitioner argues that this evidence was "false" or "misleading" because he only looked on the internet for news about the murder in Lake Stevens after he heard about it from the general news, and it is "very common for people to look up news about murders[.]" Dkt. 16 at 7. But the fact that Petitioner offers or argues for alternative explanations for the internet search and DNA evidence and disputes the inferences the factfinder should have drawn from this evidence does not establish the evidence was false or that the prosecutor knew or should have known that the evidence was false. The state courts reasonably rejected this claim.

The State also introduced evidence that Petitioner's DNA was found on the inside of the electrical cord used to bind the victim's wrist to the bed, on swabs from carpet taken from the victim's house, that his DNA and semen was also present in vaginal swabs taken from the victim, and that both the victim's and Petitioner's DNA were found on the knife that was found in Petitioner's possession when he was arrested. Dkt. 18 at 1769-70, 3156-66, 3174-75, 3190-92, 3195-3201, 3213-3215. Additionally, evidence was presented that staining on a portion of the knife tested positive for human blood that contained the victim's DNA. Dkt. 18 at 3227-3231. Petitioner argues that there are reasonable explanations for this because he admitted to being in the house where the victim was found, that he had consensual sexual contact with the victim, and that the victim had given Petitioner the knife several weeks before she was murdered. Dkt. 10 at

5-8; Dkt. 16 at 4-9, 18-21. Again, the fact that Petitioner offers or argues for alternative explanations for the presence of DNA evidence and disputes the inferences the factfinder should have drawn from that evidence does not establish the evidence was false or that the prosecutor knew or should have known that the evidence was false. The state courts reasonably rejected this claim.

Petitioner also argues that the State "presented false evidence that blood DNA was on the defendant's knife from the murder when it was put on there by the expert [Richard Wyant]." Dkt. 10 at 8; Dkt. 16 at 18. Petitioner argues that Mr. Wyant, a tool mark expert employed by the Washington State Patrol Crime Lab, stated in his defense interview, and testified at trial, that it was "'certainly possible' that the knife could have been contaminated by DNA when this expert, Mr. Wyant, was handling the knife and cords that were found to be used to tie the victim up." Dkt. 16 at 18; Dkt. 18 at 2446. Petitioner indicates that the prosecutor then elicited testimony from Mr. Wyant that the knife "certainly was not contaminated with the blood that was later found on the knife." Dkt. 16 at 18. Petitioner argues the prosecutor intentionally elicited this "false" testimony from Mr. Wyant and alternatively that the prosecutor failed to correct the "false" testimony. *Id.*

The state courts reasonably found that the testimony petitioner relies upon does not support his "false" testimony claim. The record contains the following testimony from Mr. Wyant during cross-examination by Petitioner's defense attorney, Mr. Scott:

> BY MR. SCOTT:
> Q.     Now, when you were testing the knife and these cords, you were testing cords
>        that were from the crime scene, as we talked about, right?
> A.     Yes.
> Q.     And you noticed there was blood spatter on those cords, right?
> A.     I think there was one area on the tag, I believe, the 24, but it was apparently
>        blood. I did not do any further testing.
> Q.     Do you recall doing an interview with us?
> A.     Yes.

REPORT AND RECOMMENDATION - 14

1 …
  Q.   So I handed what is now 482, and I will ask you again if you recognize what that
2      is?
  A.   I do.
3 Q.   And what is that?
  A.   That appears to be a transcript of the defense interview on February 12th, 2019. It
       is 43 pages.
4 Q.   And that was done in February of this year?
  A.   Yes.
5 Q.   So I refer you to page 19, question asked at ten, and your answer follows, if you
       could –
6 A.   Okay. You want me to read it?
  Q.   Not out loud, just read it to yourself.
7 A.   I got it.
  Q.   Okay. So you did notice there was blood on the cords, correct?
8 A.   Particularly on the tag of 24, I believe.
  Q.   You said you saw blood here and there?
9 A.   That's possible, yes.
  Q.   It's at line 14.
  A.   Right.
10 Q.  And you were not too concerned about that, right?
  A.   Yes. Typically we are the last section to receive any evidence after it's been
11     through trace and DNA.
  Q.   And because of that, you weren't concerned about contaminating the cords with
12     the knife, correct, or vice versa?
  A.   How would I contaminate the cords with the knife?
13 Q.  If you were to get blood spatter from the cords onto the knife, there would have
       been some transfer in that regard. You were not concerned about that because
14     usually you are the last one to handle it?
  A.   *The knives and the cords don't interact with each other.*
15 Q.  I understand. But you weren't concerned about that, right?
  A.   I'm still confused by your question. *I don't use the knife to cut any of the
       evidence cords. All the cuts I made were with exemplar wires from the lab.*
16 Q.  I understand.
  A.   *So they are out at separate times so there wouldn't have been a reason for
17     contamination.*
  Q.   But you handled the knives and you handled the cords, there can be transfer,
18     right?
  A.   No.
19 Q.  No. All right.
  A.   *Because I remove the cut ends for my examination from the wires. I mean, right -
20     -- and then the knife, it only interacts with the test that I do. So they don't come in
       contact with each other.*
21 Q.  The contact can be from your gloves touching both items?
  A.   Spatter wouldn't be transferred, potential DNA would, but spatter is spatter. It's
22     deposits of blood. That's from being wet.
  Q.   The potential DNA is the concern.
  A.   Your question was the blood spatter.
23 Q.  That's where the DNA would locate?
  A.   There could be DNA from touch DNA as well.
  Q.   Sure.

A.    I'm still confused by your question.

Q.    Okay. So you were usually the last person in the chain of evidence to receive it, correct?

A.    Yes.

Q.    You were aware that DNA had already been tested on this knife, correct?

A.    Yes.

Q.    So you weren't overly concerned about there being any sort of transfer from one evidence item to another because of that fact, correct?

A.    Yes, that's a fair statement.

Q.    However, if it were to be tested after you had handled it for DNA, then there would be a possibility of DNA transfer from one item to the other, correct?

A.    I suppose it's possible.

Q.    You indicated in the interview that it's certainly possible, right?

A.    *Well, as sensitive as DNA tests are now, it's possible. But as I stated, they don't typically come into contact with each other, those items.*

Q.    But you acknowledge in the interview, it's certainly possible that could have happened?

A.    Yes, I say that again, with the sensitivity of DNA contamination is possible. And that's precisely why everything goes to DNA first.

Dkt. 18 at 3136-3140 (emphasis added).

On re-direct examination, the prosecutor asked clarifying questions and elicited

the following testimony from Mr. Wyant:

Q.    *When you said the knives and the cords don't interact, what did you mean?*

A.    *Well, I am not making test cuts with the knife on evidence items, and so they are removed and examined separately, because that is part of the examination process.*

      *So first I'm looking at the cords, looking for the class characteristics. I remove those ends, those get packaged in the manila envelopes that you saw, and then I do the tests with the knife. And then the only time they come together is on both sides of the microscope. The little cut end I removed and the test cut from the knife. So the only time the knife is used when I make the test cuts, it goes back in the packaging, and then I compare the test cuts to the wire.*

Q.    Do you have a recollection, or do you know what tells you the order those things happened in this case?

A.    As well *as I stated earlier, the first part of the examination is to look at the cords and see what type of tool is used.*

      *And again, by the time you know I did all that examination prior to even receiving the knife. So the knife came after I did all the cord examinations.* But is it – I mean ---

Q.    *Well, that's what I wanted to know, can you say with any certainty whether you had already cut the ends off the evidence items before you got the knife?*

A.    *Yes, I did. To compare them to the other tools I had at the time.*

Q.    How much time do you think went by in between?

A.    I am not sure when it – I will have to go back and look. I know it was at least a few days before I received the knife from Marysville.

Q.    Do you ever wear the same pair of gloves for three days straight?

REPORT AND RECOMMENDATION - 16

A.    No.

Dkt. 18 at 3140-3142 (emphasis added).

The record reflects that Mr. Wyant testified that there would not have been blood spatter transfer to the knife during his testing. Mr. Wyant acknowledged, as he had indicated in his defense interview, that DNA transfer in the testing process was possible but that the knife in evidence was not used in the testing process to cut the actual electrical cords in evidence, that he had cut the ends off the cords in evidence several days before he even received the knife, and that he would not have worn the same gloves to test the knife as he had to test the evidence cords – indicating that such transfer was unlikely. To the extent there was any alleged inconsistency between the prior defense interview and the trial testimony such inconsistencies, while they may be used for impeachment purposes, do not, on this record, establish the knowing use of perjured testimony. See U.S. v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995) (mere inconsistencies in the evidence do not constitute the knowing use of perjured testimony by the prosecutor).

In sum, Petitioner fails to demonstrate the state court's rejection of his "false evidence" or Napue due process claims in Grounds One and Three was contrary to, or an unreasonable application of, clearly established federal law, was an unreasonable determination of the facts in light of the evidence presented at trial, or that he is otherwise entitled to habeas relief on this claim. Accordingly, Grounds One and Three should be denied.

### B.  Ground Two

In Ground Two, Petitioner identifies his claim as "False information Due Process Violation." Dkt. 10 at 7. He argues that "the state's expert [Richard Wyant] testified falsely that markings on an electrical cord were from the defendant's knife." Id. Petitioner argues that the prosecutor's expert "testified falsely" that "it was generally accepted that his method could show that markings on the electrical cord used to restrain the victim could indicate that the defendant's

knife was used to cut [the] cord." Dkt. 16 at 10. Petitioner argues that the trial transcript shows

that the expert's method was "both not generally accepted, as required by law, and was also used

to find the defendant was in possession of the knife that the State was claiming was used" in the

crime as the expert concluded the knife was used to cut the electrical cord. *Id.*

In the answer Respondent argues that Petitioner failed to properly exhaust this claim in

the state courts because he presented the claim to the state courts as a state law evidentiary issue,

not as a due process issue. Dkt. 17. However, Respondent argues that the Court need not stay the

proceedings to allow Petitioner to attempt to exhaust this claim because the claim is "plainly

meritless." *Id.* In his response to the Respondent's answer Petitioner argues that he did present

his claim as a federal constitutional claim to the state courts and, to the extent the Court finds he

did not exhaust this claim, he asks that the federal habeas action be stayed under *Rhines v.

Weber*, 544 U.S. 269, 277 (2005), so that he may return to state court to exhaust the claim. Dkt.

22.

As noted above, a petitioner properly exhausts his state remedies by "fairly presenting"

his claim in each appropriate state court, including the state supreme court with powers of

discretionary review, thereby giving those courts the opportunity to act on his claim. *Baldwin*,

541 U.S. at 29; *Duncan*, 513 U.S. at 365-66. In order to satisfy the "fair presentation"

requirement for exhaustion purposes, "[i]t has to be clear from the petition filed at each level in

the state court system that the petitioner is claiming the violation of the federal constitution that

the petitioner subsequently claims in the federal habeas petition." *Galvan*, 397 F.3d at 1204. The

state courts have been given a sufficient opportunity to hear an issue, for purposes of exhaustion,

when the petitioner has presented the state court with the issue's factual and legal basis. *Weaver

v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999); *see also Kyzar v. Ryan*, 780 F.3d 940, 947 (9th

Cir. 2015) ("In order to fairly present an issue to a state court, a [habeas] petitioner must present the substance of his claim to the state courts, including a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief." (quotation marks and citation omitted)); *Scott v. Schriro*, 567 F.3d 573, 582–83 (9th Cir. 2009) (same).

Under Ninth Circuit caselaw, a petitioner must make the federal basis of the claim explicit either by referencing specific provisions of the federal constitution or statutes or citing to federal or state cases analyzing the federal constitutional issue. *See Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005); *Lyons v. Crawford*, 232 F.3d at 668, 670 (9th Cir. 2000), *as modified by* 247 F.3d 904 (9th Cir. 2001); *see Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) ("for purposes of exhaustion, a citation to a state case analyzing a federal constitutional issue serves the same purpose as a citation to a federal case analyzing such an issue"). "If the state case [cited to] discusses both state and federal issues relevant to the petitioner's claim, however, the citation to that case must be accompanied by some clear indication that the case involves federal issues." *James v. Hill*, 171 F. App'x 678, 679 (9th Cir. 2006) (internal citation and quotation marks omitted); *see Fields v. Waddington*, 401 F.3d 1018, 1022 (9th Cir. 2005) ("[w]hen a petitioner does not label his claim as federal, the mere citation to a state court case that engages in both a state and federal constitutional analysis does not suffice to exhaust the federal claim."); *Casey v. Moore*, 386 F.3d 896, 912 n. 13 (9th Cir. 2004) ("For a federal issue to be presented by the citation of a state decision dealing with both state and federal issues relevant to the claim, the citation must be accompanied by some clear indication that the case involves federal issues."). "Raising a state claim that is merely similar to a federal claim does not exhaust state remedies." *Fields*, 401 F.3d at 1022.

Here, Petitioner did not make it clear in his briefs filed at each level in the state court system that he was claiming a violation of the federal constitution. Rather, in his PRP, Petitioner raises only state law challenges. Specifically, Petitioner argues "the facts do not satisfy the legal requirement in the State of Washington for general acceptance and the *Frye* standard." Dkt. 18 at 183. Petitioner argues "[t]his is because the method or technique used was not based on 'rigorous, empirical testing' and was not sufficiently 'peer reviewed.'" *Id.* He argues the "ten samples" used to perform the expert witness's scientific study is not a sufficient study, and that "only one person, especially when a subordinate or coworker, is not sufficient for a peer review." *Id.* And in his motion for discretionary review Petitioner again argues that the expert's testimony that the markings on the electrical cord were from the knife found in Petitioner's possession was not based on "generally accepted science." *Id.* at 229-230.

The Court concludes that Ground Two is unexhausted as Petitioner failed to fairly present his claim as a federal constitutional issue to the state courts. "In *Rhines*, the Supreme Court held that when a habeas petitioner files a mixed petition [containing both exhausted and unexhausted claims], a district court may stay the petition and hold it in abeyance to allow the petitioner to return to state court and present his unexhausted claims" *Blake v. Baker*, 745 F.3d 977, 980 (9th Cir. 2014) (citing *Rhines*, 544 U.S. at 275-76). However, this procedure "should be available only in limited circumstances." *Rhines*, 544 U.S. at 277. "A habeas petitioner must meet three requirements for a *Rhines* stay: (1) the petitioner had "good cause" for his failure to exhaust his claims in state court; (2) the unexhausted claims are not "plainly meritless"; and (3) the petitioner has not engaged in 'abusive litigation tactics or intentional delay.'" *Gordon v. Montgomery*, No. CV 22-4353, 2023 WL 2629028, at *2 (C.D. Cal. Feb. 8, 2023), *report and recommendation adopted*, No. CV 22-4353, 2023 WL 2749136 (C.D. Cal. Mar. 30, 2023)

1  (quoting *Rhines*, 544 U.S. at 277-78); *Dixon v. Baker*, 847 F.3d 714, 722 (9th Cir. 2017) (in

2  order to obtain a stay of federal habeas proceedings under *Rhines*, a federal habeas petitioner

3  "must establish that at least one of his unexhausted claims is not 'plainly meritless.'").

4  Furthermore, "a federal court may deny an unexhausted petition on the merits …when it is

5  perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett v.*

6  *Stewart*, 406 F.3d 614, 624 (9th Cir 2005).

7        Under U.S.C. § 2254(a), habeas relief is available only where petitioner is contending

8  that he is in custody in violation of the Constitution or laws or treaties of the United States. As

9  such, alleged errors in the application of state law are not cognizable on federal habeas review.

10  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996), *cert. denied*, 522 U.S. 811 (1997).

11  "Federal courts repeatedly have concluded that claims that are not cognizable on federal habeas

12  review, particularly claims that raise only state law concerns, are plainly meritless under the

13  *Rhines* test." *Gordon*, 2023 WL 2629028, at *4 (citing *Avila v. Kirkland*, 249 F. App'x 695, 696

14  (9th Cir. 2007) (concluding that a claim challenging a "state law determination" on a jury

15  instruction failed "to present a federal constitutional question" and therefore was meritless under

16  *Rhines*), *Diaz*, 2018 WL 8220543, at *6-*7 (C.D. Cal. Oct. 17, 2018) (concluding that claims

17  challenging the erroneous admission of evidence were non-cognizable state law challenges that

18  were plainly meritless under *Rhines*)).

19        Here, although Petitioner indicates he is raising a "false" evidence due process claim, he

20  offers no facts or evidence that would support such a claim. Petitioner offers nothing more than

21  his conclusory assertion that Mr. Wyant's testimony regarding the cord cutting was "false" and

22  offers no facts or allegations to support the element of the claim that the prosecution knew or

23  should have known that the testimony was false or that the false testimony was material, *i.e.*, that

1    there is a reasonable likelihood that the false testimony affected the factfinder's decision. Rather,

2    although Petitioner attempts to recharacterize his claim as a federal constitutional claim, in

3    substance Petitioner is disagreeing with the trial court's evidentiary ruling that the expert

4    testimony about tool marks on the cut electrical cords found at the crime scene was admissible

5    under state law.

6          Petitioner specifically argues again, as he did in his PRP, that the "the facts do not satisfy

7    the legal requirement in the State of Washington for general acceptance and the *Frye* standard."

8    Dkt. 16 at 17. Petitioner argues "[t]his is because the method or technique used was not based on

9    'rigorous, empirical testing' and was not sufficiently 'peer reviewed.'" *Id.* He argues the "ten

10   samples" used to perform the expert witness's scientific study is not a sufficient study, and that

11   "only one person, especially when a subordinate or coworker, is not sufficient for a peer review."

12   *Id.*

13         Although Petitioner now attempts to recharacterize Ground Two as a federal

14   constitutional claim, this is not sufficient to render it as such. *See Diaz*, 2018 WL 8220543, at

15   *6-*7 ("[t]he fact that petitioner now is attempting to characterize his claims as federal

16   constitutional claims is not sufficient to render them such."); *and see Little v. Crawford*, 449

17   F.3d 1075, 1083 (9th Cir. 2006) ("We cannot treat a mere error of state law, if one occurred, as a

18   denial of due process; otherwise, every erroneous decision by a state court on state law would

19   come here as a federal constitutional question."), *cert. denied*, 551 U.S. 1118 (2007); *Langford*,

20   110 F.3d 1380 at 1389 (petitioner may not "transform state-law issue into a federal one merely

21   by asserting a violation of due process"); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.

22   1994) (notwithstanding petitioner's characterization of claim as due process violation, claim was

23   matter of state criminal procedure not within purview of federal habeas court), *cert. denied*, 514

1   U.S. 1026 (1995); *Hendricks v. Zenon*, 993 F.2d 664, 674 (9th Cir. 1993) (notwithstanding

2   petitioner's argument that due process rights violated, claim exclusively concerned with state law

3   and therefore was not cognizable in a federal habeas corpus proceeding). Petitioner's bare

4   assertion of a due process violation based on "false" testimony is conclusory and unsupported by

5   facts or evidence. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which

6   are not supported by a statement of specific facts do not warrant habeas relief."); *Underdahl v.*

7   *Hill*, No. 20CV1292, 2020 WL 7385846, at *17 (S.D. Cal. Dec. 16, 2020) (citing *Cassett*, 406

8   F.3d at 624 and acknowledging that while one of petitioner's claims was unexhausted, "the Court

9   [would] exercise discretion to adjudicate it because it clearly fails on the merits", and finding

10  petitioner's conclusory allegations were insufficient to raise a colorable claim).

11          Accordingly, a stay is not appropriate under *Rhines* and Ground Two should be dismissed

12  as it fails to raise a colorable federal claim and is plainly meritless.[4]

13          Additionally, even if Petitioner's claim was exhausted as he claims, he fails to establish

14  he is entitled to habeas relief. In addressing Petitioner's claim regarding the expert's testimony

15  regarding the cut electrical cords in his PRP, the Court of Appeals stated:

16          As to the admissibility of testimony about tool marks on the cut cords found at the
            murder scene, the court found the evidence to be "reliable, generally accepted science,
17          and not overly subjective." Without challenging or even mentioning this finding, Garver
            argues that the testing and methodology to support the conclusion that the same knife
18          Garver possessed was likely used to cut cords that bound the victim was not generally

19  _____

    [4] The Court notes that generally, "a district court must dismiss habeas petitions containing both
20  unexhausted and exhausted claims." *Rose v. Lundy*, 455 U.S. 509, 522 (1982). But, "in cases where the
    unexhausted claims do not present even colorable federal questions, denial on the merits of the exhausted
21  claims is preferable to dismissal of the Petition for failure to exhaust non-cognizable claims." *Gordon*,
    2023 WL 2629028, at *5 *report and recommendation adopted*, 2023 WL 2749136 (citing *Granberry v.*
    *Greer*, 481 U.S. 129, 135 (1987) (noting that where it is "perfectly clear that the [petitioner] does not raise
22  even a colorable federal claim, the interests of the petitioner, the warden, the state attorney general, the
    state courts, and the federal courts will all be well served" if the district court addresses the habeas
23  petition on the merits)). Moreover, Courts have held that when a federal habeas claim "fail[s] to allege a
    deprivation of a federal right, ... it is unnecessary for us to determine whether the prisoner satisfied the §
    2254(b) exhaustion requirement." *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983) (citing *Engle*
    *v. Isaac*, 456 U.S. 107, 120 n. 19 (1982)).

REPORT AND RECOMMENDATION - 23

accepted, and therefore the testimony was inadmissible under ER 702. *See State v. Pigott*, 181 Wn. App. 247, 249, 325 P.3d 247 (2014) (novel scientific evidence is admissible only if based on a theory or principle that is generally accepted in the relevant scientific community). But a trial court's erroneous admission of expert testimony under ER 702 does not necessarily implicate constitutional rights. *See State v. Barr*, 123 Wn. App. 373, 380, 98 P.3d 518 (2004). Garver does not contend that the alleged evidentiary error implicated a constitutional right. And, in light of the substantial evidence of Garver's guilt, he cannot establish that admission of the expert witness's testimony resulted in actual and substantial prejudice, let alone a complete miscarriage of justice.

Dkt. 18 at 211-12.

The Washington Supreme Court, in denying Petitioner's motion for discretionary review, found:

> Garver also contends that expert testimony linking the knife he possessed with marks on cut cords found at the murder scene was not based on accepted science. But as the chief judge noted, Garver does not mention or address the superior court's finding otherwise. Further, given all of the other evidence of guilt, he fails to establish prejudice from the admission of this testimony.

Dkt. 18 at 291.

As noted above, Petitioner presents no facts or evidence beyond his own conclusory assertions to support a due process claim under *Napue* based on alleged "false" testimony by the expert witness. Petitioner offers no facts or evidence to support his conclusory allegation that the expert's testimony was "false" but, rather, appears only to reiterate his state law challenge to the sufficiency of the expert witness's testimony – specifically that the testing and peer review process were sufficient to meet the state law evidentiary standard, and that the knife found in defendant's possession was used to cut the electrical cords found at the crime scene. Petitioner does not argue and presents no facts or evidence to support a finding that the prosecution knew or should have known that the testimony was false.

The Court also finds that even if Petitioner could meet the other elements under *Napue*, given the other significant evidence of guilt, Petitioner fails to show there is a reasonable likelihood the expert's testimony on this issue affected the factfinder's decision. Specifically, the

REPORT AND RECOMMENDATION - 24

Court notes the evidence in the record that Petitioner and the victim were together, and captured on video surveillance footage, a few days before her body was found (Dkt. 18 at 1599-1601, 1769-76, 3445-51); that on that same day, and on the last day she was known to have been seen alive, the victim told a friend that she and Petitioner were going to the house where she was staying to get a laptop for Petitioner to use (*id.* at 2213-17); Petitioner was identified by DNA found on electrical cord ligatures used to restrain the victim as well as in the house and on the victim's body (*id.* at 1597, 1769-70, 3156-66, 3174-75, 3190-92, 3213-15); when he was arrested two weeks after the murder, Petitioner had a knife in his possession (*id.* at 2662-65) and DNA on the knife blade matched both Petitioner and the victim (*id.* at 3195-3201, 3227-3231); Petitioner possessed a laptop computer that had been used by the victim and contained documents related to research about killing someone with a knife, related to creating a disguise, as well as searches for news of the murder in Lake Stevens including references to articles on the murder of the victim (*id.* at 973, 977-78, 1012, 2663-64, 2771, 2784-95); an individual with whom he shared an abandoned house at the time of the murder testified that Petitioner disappeared from the house for several days around the time of the murder (*id.* at 2538-39, 2546-47); and a fellow jail inmate testified that Petitioner threatened to slit the inmate's throat, as he had done to the victim (*id.* at 2738, 2740-41, 2751).

Accordingly, even if Ground Two were properly exhausted, Petitioner fails to show he is entitled to habeas relief on this claim, and it should be denied and dismissed.

## C.  Ground Four

In Ground Four, Petitioner identifies his claim as "Reasonable Doubt and Sufficiency of the Evidence." Dkt. 10 at 10; Dkt. 16 at 22-29. He argues that there's a reasonable explanation for his DNA being found at the house and on the electrical cord ligatures because he was at the

victim's house at a different time than when she was killed and handled either the victim's VCR or coffee pot. Dkt. 16 at 22-29. He also argues there is a reasonable explanation for his DNA being on the victim because he admitted having consensual sex with the victim a few days before her body was found. *Id.* Petitioner also argues the witness testified falsely that he was not at the abandoned house where he had been staying because he returned to the abandoned house on Friday after leaving the victim still alive. *Id.* He also argues the witness would not have known if he was at the abandoned house because she was upstairs the entire time he was there and he did not go upstairs. *Id.*

Petitioner argues the knife wound and blood spatter did not show the wounds were inflicted by a left-handed person. *Id.* Petitioner argues that even though he is left-handed, "that is not the angle or direction he normally would move his hand if he was doing a physical act with it" – he would have moved it in the opposite direction. *Id.*

Petitioner argues there is reasonable doubt because he never had anal sex with the victim, and does not have anal sex generally, and semen was found on the anal swab taken from the victim. *Id.* Petitioner posits therefore it must have been someone else's semen or that some else, while wearing a condom, transferred his semen from the victim's vagina to her anus. *Id.*

Petitioner also argues that the trial judge was "saying things that were not supported by the evidence presented at trial." *Id.* Specifically, Petitioner argues the trial judge improperly speculated that Petitioner must have "'super sperm' because it stayed alive with the heads and tails for three days", improperly speculated that the victim was wearing sweat pants so the Petitioner could take them on and off and maybe even have sex with the dead body, and improperly speculated that Petitioner might have raped the victim but that no one would know because she was dead. *Id.*

The Constitution forbids the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). When evaluating a claim of insufficiency of the evidence to support a conviction, the reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "*Jackson* leaves [the factfinder] broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that [the factfinder] 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S.Ct. 2060, 2064 (2012) (quoting *Jackson*, 443 U.S. at 419). The factfinder is entitled to believe the State's evidence and to disbelieve the defense's evidence. *Wright v. West*, 505 U.S. 277, 296 (1992). The prosecution need not affirmatively "rule out every hypothesis except that of guilt," and a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 319, 326.

In deciding Petitioner's PRP, the Court of Appeals rejected Petitioner's claim that the evidence was insufficient to support his conviction, stating:

> The evidence presented at trial established that Garver and the victim were together, and captured on video surveillance footage, a few days before her body was found. On the last day she was seen alive, the victim told a friend that she and Garver were going to the house where she was staying to get a laptop for Garver to use. Garver was identified by DNA and semen evidence found in the house and on the victim's body. When he was arrested two weeks after the murder, Garver had a knife in his possession, and DNA on the knife blade matched both Garver and the victim. He also possessed a laptop computer that had been used by the victim and contained documents related to research about killing someone with a knife.
>
> …
>
> Finally, Garver claims the evidence was insufficient to support his conviction because: (1) there were logical explanations as to why his DNA was recovered on electrical cord ligatures and elsewhere in the house and for the presence of his semen; (2) testimony that he was not at the abandoned house around the time of the murder was

false; (3) he returned to the abandoned house a few days before the victim's body was found; (4) the knife wound did not establish that the perpetrator was left-handed; (5) the presence of semen on anal swabs indicates that someone else had sexual intercourse with the victim within the timeframe of the murder because he and the victim did not have anal sex; and (6) the evidence did not support the conclusion that sexual intercourse took place shortly before the body was found.

When considering a challenge to the sufficiency of the evidence, this court evaluates the evidence in the light most favorable to the State. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). In other words, a petitioner who challenges the sufficiency of the evidence admits the truth of the State's evidence as well as all reasonable inferences that can be drawn from it. *Id.* Circumstantial evidence and direct evidence are deemed equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

Garver's argument relies on his own self-serving and selective interpretation of the evidence and ignores much of the evidence of guilt, including his own damaging statements. The finder of fact was not required to credit Garver's testimony or draw the same inferences from the evidence that he does. In fact, the trial court specifically found that Garver was not credible and this court defers to the finder of fact as to "conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Ainslie*, 103 Wn. App. 1, 6, 11 P.3d 318 (2000). As detailed above, ample evidence supported Garver's conviction and a rational trier of fact could have found guilt beyond a reasonable doubt. *See Salinas*, 119 Wn.2d at 201.

Dkt. 18, Ex. 12 at 210, 213-214.

In denying Petitioner's petition for review, the Washington Supreme Court also rejected petitioner's claim, stating:

Finally, Garver contends that the State did not prove his guilt beyond a reasonable doubt. But he does not show that to be the case when the evidence and the reasonable inferences therefrom are viewed, as they must be, in the light most favorable to the State. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Dkt. 18, Ex. 14 at 291.

Petitioner was found guilty of first-degree murder with a deadly weapon. Dkt. 18 at 304-316, 673-75. Revised Code of Washington (RCW) 9A.32.030 provides: "A person is guilty of murder in the first degree when: (a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." RCW 9.94A.533(4) provides:

The following additional times shall be added to the standard sentence range for felony crimes committed after July 23, 1995, if the offender or an accomplice was armed with a deadly weapon other than a firearm as defined in RCW 9.41.010 and the offender is

being sentenced for one of the crimes listed in this subsection as eligible for any deadly
weapon enhancements based on the classification of the completed felony crime.

RCW 9.94A.825 provides:

In a criminal case wherein there has been a special allegation and evidence establishing
that the accused or an accomplice was armed with a deadly weapon at the time of the
commission of the crime, the court shall make a finding of fact of whether or not the
accused or an accomplice was armed with a deadly weapon at the time of the commission
of the crime, or if a jury trial is had, the jury shall, if it find[s] the defendant guilty, also
find a special verdict as to whether or not the defendant or an accomplice was armed with
a deadly weapon at the time of the commission of the crime.

For purposes of this section, a deadly weapon is an implement or instrument which has
the capacity to inflict death and from the manner in which it is used, is likely to produce
or may easily and readily produce death. The following instruments are included in the
term deadly weapon: Blackjack, sling shot, billy, sand club, sandbag, metal knuckles, any
dirk, dagger, pistol, revolver, or any other firearm, any knife having a blade longer than
three inches, any razor with an unguarded blade, any metal pipe or bar used or intended
to be used as a club, any explosive, and any weapon containing poisonous or injurious
gas.

Here, the state courts reasonably concluded that the evidence, when viewed in the light
most favorable to the prosecution, was constitutionally sufficient to support the trial court's
guilty finding on the charge of first-degree murder with a deadly weapon, *i.e.*, that Petitioner,
with premeditated intent, caused the death of the victim, and that at the time of the commission
of the crime the defendant was armed with a deadly weapon other than a firearm, to wit, a knife.
Dkt. 18 at 675.

Specifically, there was evidence in the record that Petitioner and the victim were
together, and captured on video surveillance footage, a few days before her body was found
(Dkt. 18 at 1599-1601, 1769-76, 3445-51); that on that same day, and on the last day she was
known to have been seen alive, the victim told a friend that she and Petitioner were going to the
house where she was staying to get a laptop for Petitioner to use (*id.* at 2213-17); Petitioner was
identified by DNA found on electrical cord ligatures used to restrain the victim as well as in the
house and on the victim's body (*id.* at 1597, 1769-70, 3156-66, 3174-75, 3190-92, 3213-15);

1    when he was arrested two weeks after the murder, Petitioner had a knife in his possession (*id.* at

2    2662-65) and DNA on the knife blade matched both Petitioner and the victim (*id.* at 3195-3201,

3    3227-3231); a ligature/cord used on the victim had blade markings found to be consistent with

4    being cut by the knife recovered from Petitioner (*id.* at 3074-82, 3092-96); Petitioner possessed a

5    laptop computer that had been used by the victim and contained documents related to research

6    about killing someone with a knife, related to creating a disguise, as well as searches for news of

7    the murder in Lake Stevens including references to articles on the murder of the victim (*id.* at

8    973, 977-78, 1012, 2663-64, 2771, 2784-95); an individual with whom he shared an abandoned

9    house at the time of the murder testified that Petitioner disappeared from the house for several

10   days around the time of the murder (*id.* at 2538-39, 2546-47); and a fellow jail inmate testified

11   that Petitioner threatened to slit the inmate's throat, as he had done to the victim (*id.* at 2738,

12   2740-41, 2751).

13        Petitioner's alternative explanations for the presence of his DNA and semen at the

14   premises and on the victim, that he had returned to the abandoned house where he was staying

15   before the victim was murdered, and his assertion that another individual must have had sex with

16   the victim because he does not have anal sex, do not establish there was insufficient evidence to

17   support his conviction. Petitioner's arguments are premised entirely on his own self-serving,

18   uncorroborated arguments and testimony which the trial court was entitled to find, and did find,

19   not to be credible, particularly in light of the significant evidence in the record of guilt. Dkt. 18 at

20   675-76; *see Wright*, 505 U.S. at 296 (rejecting a challenge to the sufficiency of the evidence and

21   finding that the trier of fact was entitled to disbelieve the defendant's uncorroborated and

22   confused testimony).

23

Petitioner also argues that the knife wound, and blood spatter did not show the wounds were inflicted by a left-handed person because even though he is left-handed, "that is not the angle or direction he normally would move his hand if he was doing a physical act with it." However, this argument is similarly self-serving as well as speculative and does not undermine, or render insufficient, the significant evidence (discussed above) supporting Petitioner's conviction. The Court also notes that, in affirming the conviction on direct appeal, the Court of Appeals concluded that the trial judge, in rendering his written findings of fact and conclusions of law, did not include the inference regarding blood spatter evidence as indicating the murder was done by a left-handed individual that was initially included in his oral ruling from the bench, and that those remarks did not form a basis for the conclusions reached by the court. *See* Dkt. 18 at 136-142, 675-76.

Petitioner argues that the trial judge improperly speculated that Petitioner must have "super sperm", that the victim was wearing sweatpants so the Petitioner could take them on and off and maybe even have sex with the dead body, and that Petitioner might have raped the victim. The Court notes that Petitioner appears to refer to statements made by the trial judge in issuing his oral ruling finding Petitioner guilty. With respect to the "super sperm" comment, during his oral ruling the trial judge stated that:

> When Mariah Low testified about her observations of the sperm she indicated that they still had partial tails as she observed them through a microscope. This means they were still active or motile in the terminology of this type of work. She testified that under normal conditions, when the host is alive sperm tails survive from one to three hours. …She testified that this period could be elongated if the body was deceased. And in this case the vaginal swabs were not collected until June 18th afternoon, over 96 hours later. This evidence leads to one of two inferences.
> One, either the testimony about having sex on Friday morning [June 14th] is not true and the sex occurred at a time closer to the collection of the specimens; or two, Anthony has super sperm able to survive above the normal time normal sperm is active.
> In this Court's view the super sperm inference is not reasonable. It is highly unlikely that tail survival could be extended to 96 hours from one to three hours simply by death.

REPORT AND RECOMMENDATION - 31

1

> The more reasonable assumption is that the sex occurred much closer to the time of collection or even after the body was deceased.

Dkt. 18 at 3630-31.

The record shows that Mahriah Low testified that:

> [Mahriah Low]: [T]he unique thing I saw about these ones is there were partial tails attached to some of the sperm that I saw on the microscope slide for the vaginal sample.
> That's unique to us simply because usually we do not see tails that are attached to them. They fall off quite quickly. And so in the research and in my training we recognize that happens very quickly. So we know the time frame from deposition to collection had to be a little bit shorter than what we are used to. So in the literature, it ranges, but we usually say between one and three hours.
> [Prosecutor] Q: These swabs were from the medical examiner that were taken at least a day after you first saw the body, so how do you get sperm that's one to three hours old?
> [Mariah Low] A: So my theory that it happens because of the death and then the decomposition that there is not active body fluids trying to drain out semen, as well as degraded.

Dkt. 18 at 3193-94.

The trial judge further stated in his oral ruling that: "The assailant cut [the victim's] top and undershirt off by cutting it down the middle…selected and put new loose clothing on her so he could pull her shirt, and/or pull down her pants and continue the sexual assault[.]" Dkt. 18 at 3633. There was evidence presented at trial that the clothes the victim was last seen wearing were found in a bloody pile on the floor in a room in the house, the shirts having been cut or torn open, and that the sweatpants she wore in death were tied in a particular style of knot which the trial judge observed and found to be similar to that used to tie pants located in Petitioner's backpack when he was arrested.[5] Dkt. 18 at 2320-22, 1951-52, 3629, 3489-90. There was also evidence in the record that Petitioner studied knot making. Dkt. 18 at 3488-90.

---

[5] The Court notes that references were made to pictures of the knots which were introduced into evidence. These pictures do not appear to have been included in the record before the Court. However, Petitioner does not appear to directly challenge the trial judge's observation of the similarity between the knots and the Court does not find supplementation of the record is necessary in order to resolve Petitioner's claims.

REPORT AND RECOMMENDATION - 32

The Court first notes that the specific statements by the trial judge Petitioner appears to challenge were not included in the trial court's formal written findings of fact and conclusions of law. *See* Dkt. 18 at 673-75. Moreover, the trier of fact was entitled to draw reasonable inferences from the evidence. Furthermore, as discussed above, ample evidence in the record supports the conviction, and, as the state courts found, a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found Petitioner guilty of first-degree murder with a deadly weapon beyond a reasonable doubt.

Petitioner fails to demonstrate the state court's conclusion that there was sufficient evidence for the trial judge to determine Petitioner was guilty of murder in the first degree was contrary to, or an unreasonable application of, clearly established federal law, was an unreasonable determination of the facts in light of the evidence presented at trial, or that he is otherwise entitled to habeas relief on this claim.  Accordingly, Ground Four should be denied.

## EVIDENTIARY HEARING

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011). A hearing is not required if the allegations would not entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*; *see Cullen*, 131 S.Ct.

1388. The Court finds it is not necessary to hold an evidentiary hearing in this case because Petitioner's claims may be resolved on the existing state court record.

As discussed above, Grounds 1, 3 and 4 were adjudicated on the merits by the state courts, and the state courts' rejection of the claims are neither contrary to or an unreasonable application of clearly established Supreme Court law or based upon an unreasonable determination of the facts given the record. Under these circumstances, this court is barred from conducting an evidentiary hearing to further develop the facts on Petitioner's claims. *Pinholster*, 563 U.S. at 185 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitations of § 2254(d)(1) on the record that was before the state court.")[6]; s*ee also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("Although the Supreme Court has declined to decide whether a district court may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been satisfied . . . an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.") (internal quotation marks and citation omitted).

With respect to Ground 2, the Court finds this claim is unexhausted, fails to raise a colorable federal claim and is plainly meritless and an evidentiary hearing is not necessary. And even if the claim were properly exhausted as Petitioner argues, the claim may be resolved on the existing record.

---

[6] The *Pinholster* limitation also applies to claims brought under § 2254(d)(2). *See Gulbrandson v. Ryan*, 738 F.3d 976, 993, n. 6 (9th Cir. 2013) ("*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well. *See* § 2254(d)(2) (allowing for habeas relief if the state court decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.') (emphasis added); *Pinholster*, 131 S.Ct. at 1400 n. 7 (comparing (d)(1) to (d)(2) and stating that (d)(1) 'also is plainly limited to the state-court record.') (emphasis added)").

REPORT AND RECOMMENDATION - 34

In sum, the Court concludes Petitioner is not entitled to habeas relief and that his claims may be resolved by review of the existing record. No evidentiary hearing is required.

## CERTIFICATE OF APPEALABILITY

A prisoner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of the petition only after obtaining a certificate of appealability ("COA") from a district or circuit judge. A COA may be issued only where a petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that Petitioner is not entitled to a COA with respect to any of the claims asserted in his petition. Petitioner should address whether a COA should issue in his written objections, if any, to this Report and Recommendation.

## CONCLUSION

The Court recommends GRANTING Petitioner's "motion for praecipe or to amend petition" (Dkt. 20) and substituting Rob Jackson as the Respondent in this action, DENYING the federal habeas petition (Dkts. 10, 16, 20) without an evidentiary hearing and DISMISSING the case with prejudice. The Court also recommends that issuance of a certificate of appealability (COA) be DENIED.

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **April 8, 2024.** The Clerk should note the matter for **April 12, 2024**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. The failure to timely object may affect the right to appeal.

DATED this 18th day of March, 2024.

BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 36